19 So.2d 777

## WILSON v. STATE.
### 4 Div. 841.

Court of Appeals of Alabama.
May 16, 1944.

Rehearing Denied June 6, 1944.

Reversed on Mandate Nov. 14, 1944.

J. N. Mullins, Jr., and J. N. Mullins, both of Dothan, and Theodore R. Ward, of Abbeville, for appellant.

Wm. N. McQueen, Acting Atty. Gen., and Forman Smith, Asst. Atty. Gen., for the State.

BRICKEN, Presiding Judge.

The indictment in this case contained two counts. Conviction of the defendant was upon count one, which reads as follows: "The Grand Jury of said county charge, that before the finding of this indictment that Lloyd Wilson feloniously took and carried away one heifer calf, the personal property of Charley Haywood," etc.

After hearing the evidence and arguments of counsel, also the charge of the court, the jury returned the following verdict: "We the jury find the defendant guilty of grand larceny as charged in count one of the indictment." Whereupon the defendant was duly adjudged guilty of said offense, and judgment of conviction was properly pronounced and entered. The defendant was sentenced by the court to serve three years imprisonment in the penitentiary. From said judgment this appeal was taken.

The evidence shows without dispute that the heifer calf involved in this case had been stolen from its rightful owner, Charley Haywood, the alleged injured party, about the last of March or the first of April 1942. In October, 1942, Haywood found his heifer calf in the field of Mr. Wade Searcy. When so found the ears of the heifer calf had been cut off. Mr. Wade Searcy testified as follows:

"During last year I bought a black heifer calf from Mr. Lloyd Wilson, the defendant. The marks of identification on that calf were that it had ears cut mighty near off, both of them. It was along the last of September or the first of October, 1942, when I bought the calf. Somewhere along about the middle of October, Charley Haywood came to see me about that yearling. I kept the yearling somewhere about three weeks. About the time he came to see me or just after that time this defendant, Lloyd Wilson, came to me and talked to me about the yearling and Mr. Haywood was present. Mr. Haywood came over there and asked me about the yearling and I told him about the yearling down there in my fields. I had fourteen yearlings down there. He said if you don't care I would like to go look at them, and I said go ahead and told him where they were at. He came back and said it was his yearling and I said if it is your yearling I want you to have it, and he said I will tell you I will come back tomorrow and let you know what to do about it. He came back the next morning and talked to me a few minutes and said he was going to see Mr. Wilson and he went off and was gone something like an hour or an hour and a half and come back and told me Mr. Wilson will be out here to see you, and he hadn't more than got through when Mr. Wilson come up and called me out there and asked me if he would give me my money back would I let Mr. Haywood have the yearling and I said 'sure' and he gave me the money back and I told Mr. Haywood to go get his yearling, and he come the next day and got it.

"The Court then asked the witness: Where did that occur? Was it here in Henry County?

"The witness: Yes, sir.

"The Court: And you bought it here in Henry County?

"The Witness: Yes, sir.

"On cross examination the witness testified as follows: Yes, when this man Haywood went off to see Mr. Wilson, he did come back to see me; and Mr. Haywood got the yearling the next day and Mr. Wilson paid me the money. Mr. Haywood got the yearling back the same day Mr. Wilson paid me the money."

At the time this heifer was brought to the defendant's farm, he, defendant, had two negro tenants on his place, viz.: Rob Feagan and Pearl Feagan, man and wife. These two persons were State witnesses and their testimony was of the same import. Pearl Feagan testified as follows:

"I am the wife of Rob Feagan that just left the stand. During the month of April of last year, my husband and I lived with and worked for Mr. Lloyd Wilson, the defendant. During that month I seed a black heifer calf brought there to his house. Mr. Lloyd Wilson brought it there. He had a rope on it and he was driving it and the calf running in a trot, and he ran up there in the back yard with the calf and he said: to his wife, 'I got back,' and she said: 'Yes, I see you did.' When I first saw him driving that calf he came from through the woods. He had a rope on it. When got there to the back of his house he told his wife to come out and hold the calf, and she said she couldn't do it, and he said I can hold her, and he ran the rope around this pecan tree, drawed the calf's head against the tree right close and clipped his ears. I couldn't tell whether it was a knife or what it was, but he cut both ears off. He cut both ears off immediately after he drove it up there. He then put the calf in the cow pen. The cow pen was an old log crib and he told his wife to open the door, and she said: 'What are you going to do,' and he said: 'I am going to put her in here, what in the hell do you think I am going to do with her.' And he drove the calf into the crib door. I am sure the calf stayed in there two weeks. He then put the calf in the pasture."

It appears from the record that after this appellant had been arrested charged with the larceny of the heifer, he, in turn, swore out a warrant against his negro tenant, Rob Feagan, above mentioned, charging him with the larceny and claiming that his (appellant's) son had bought the heifer from Feagan. In this connection the defendant (appellant) testified, among other things: "I did not steal the yearling. Rob Feagan brought it there and sold it to my boy Eugene Wilson. I sold the yearling to Mr. Searcy." On cross-examination he stated, "I did take out a warrant against that negro and I made the affidavit before Judge Norden, and in that affidavit I swore that Rob Feagan, with intent to defraud, sold a black heifer yearling to me and not to my boy."

Appellant's earnest counsel in the brief of appellant, states:

"There is only one question insisted on by appellant in this case, namely:

"(1) The court committed error in overruling the objections of the defendant to the testimony elicited by the State of the witnesses Lloyd Wilson and Dan Trammell.

"In both these instances the State was calling for a conversation between the defendant and the witness Trammell which did not embody an express admission of guilt, but which was an effort on the part of the defendant to compromise matters under discussion."

Relative to the foregoing the record shows that appellant on cross-examination testified:

"I know Mr. Dan Trammell, but I never went to see him after this case came up and I had been arrested on a warrant in County Court about that calf; but Mr. Dan Trammell sent me word two or three times to come to see him. I did not go to see him. I struck him on the road. I did not see him on Sunday and then and there ask him, Mr. Trammell, to try to get that thing settled and get that case dismissed and I would pay the costs in my case and in the negro's case. Then the Solicitor asked the witness: Q. And didn't you see him the next day, which was on Monday, and again ask him to try to get that case settled and you would pay the costs?

"I did take out a warrant for Rob Feagan for stealing that yearling. The Solicitor then asked the witness: And after you took out the warrant for him you saw Mr. Dan Trammell on one Sunday and then asked him to try to get that case against you and the case against the negro, the criminal case, dismissed, and you would pay the costs in both cases, didn't you?

"Witness then answered: No, Sir, I didn't do any such thing.

"The Solicitor then asked the witness: 'And the following Sunday didn't you see Mr. Dan Trammell and didn't you the third time ask him to try to get those cases dismissed and you would pay the costs in both cases?' The witness answered: No, sir.

"On Rebuttal, the State introduced Dan Trammell as a witness and he testified as follows: My name is Dan Trammell and I know Lloyd Wilson. The following then took place (The Solicitor Questioning): Q. Mr. Trammell, did you have a conver-

sation with this defendant, Lloyd Wilson, regarding a case where he had been arrested, a case here in County Court, charging him with stealing a black heifer calf? A. Yes, sir.

"He asked me to see Mr. Haywood and see if I could get a settlement with him on that case, on both cases, and if I could he would pay me for all my trouble, whatever I charged, and he would pay all the costs in both cases and get it out of court. The witness further testified that Mr. Wilson saw him the next day about 12 o'clock in town and over there about Northcutts Drug Store and no body but me and him heard the conversation. He then said that the defendant asked him to go to see that man to see if I could settle it and that the man he wanted him to see was Mr. Halstead. And I told him I understood he couldn't settle it after it had gone through Court. The witness further testified that he later had another conversation with the defendant when he came back to his house that same night on Monday and he wanted to go with him to Charley Haywood's and for him and me to go to see Rob Feagan and see if we could get it settled that way.

"On rebuttal Rob Feagan, for the State testified as follows: I did not sell a black heifer calf with his ears cut off to Eugene Wilson, the son of the defendant, about the first of March last year. I did not take a black heifer with a halter on it into the back yard of Mr. Lloyd Wilson and there sell it to his son for $10.00. I never owned a black heifer calf, nor did I keep it in my garden for about two weeks during the month of February of last year."

In the rulings complained of there was no error committed by the trial court. It is clear to this court that the theory of the trial judge in making said rulings was in line with the firmly established rule of law that the acts, declarations, and demeanor of an accused, before or after the offense, whether part of the res gestae or not, are admissible *against him,* but unless a part of the res gestae are not admissible for him. In other words, acts, declarations and demeanor of the accused tending to show a consciousness of guilt. Montgomery v. State, 17 Ala.App. 469, 471, 86 So. 132; Maddox v. State, 159 Ala. 53, 48 So. 689; Jones v. State, 181 Ala. 63, 78, 61 So. 434; Bass v. State, 219 Ala. 282, 284, 122 So. 45.

After a full careful consideration of the evidence, bearing upon the sole question involved, we are clear to the conclusion that a reasonable inference therefrom as to the acts, declarations, demeanor, etc., of the accused, he was frantically undertaking to avoid punishment for the commission of the offense with which he was charged and which the State's evidence tended strongly to prove his guilt. We accord to the manifest position taken by the learned trial judge that in no sense could the conduct of the accused be construed as to effect a compromise. Here, this defendant, a white man, had been arrested upon a warrant charging him with the offense of grand larceny. The principal witnesses were his negro tenants. As stated, after his arrest, he swore out a warrant against his negro tenant as being the perpetrator of the crime, and yet he undertakes, as shown by the testimony, to hire Mr. Dan Trammell, and did hire him to try to get not only his own case dismissed or disposed of, but also the case he made against his negro tenant likewise, offering as the evidence tends to show to not only pay Mr. Trammell for his efforts to this end, but also to pay all charges on both cases, this case he instituted against the negro as well as his own case. The record shows he not only sought to have Trammell see Mr. Haywood, but also to see Rob Feagan, and Mr. Halstead who was probably the trial judge, as the name is the same. The actions of the defendant above quoted, and others of like import, do not, as held by the trial court, bring the defendant within the rule insisted upon by his earnest counsel.

There appears no reversible error on the trial of this case in the court below. The record is regular in all respects, and therefore the judgment of conviction from which this appeal was taken will stand affirmed.

Affirmed.

SIMPSON, Judge (dissenting).

On the principle that efforts to compromise or settle cannot be proved as admissions against a party making them (Sanders v. State, 148 Ala. 603, 607, 41 So. 466, 468), I respectfully dissent.

The testimony of the witness Trammell that defendant sought his aid to effect a settlement of the criminal prosecution clearly comes within the proscriptions of this rule.

564

The exception, discussed in Harrison v. State, 235 Ala. 1, 178 So. 458, that the rule is inapplicable where the voluntary offer of settlement embodies an express admission of guilt, has no play here. Defendant made no such admission.

Due objection and exception were made and reserved to the said testimony of Trammell, and I am constrained to conclude that error prevailed in its admission. The principle is ably treated by Mr. Justice Brown in the Harrison case, above. Other cases are: Martin v. State, 2 Ala.App. 175, 56 So. 64; Wilson v. State, 73 Ala. 527; Sanders v. State, 148 Ala. 603, 41 So. 466; Spinks v. State, 14 Ala.App. 75, 71 So. 623; Vowell v. State, 20 Ala.App. 322, 101 So. 780; Bedingfield v. State, 24 Ala.App. 398, 135 So. 656; Richardson v. State, 28 Ala. App. 432, 186 So. 574; Kennamer v. State, 28 Ala.App. 317, 183 So. 892.

PER CURIAM.

Reversed and remanded on authority of Wilson v. State, Ala.Sup., 19 So.2d 780 (Code 1940, Tit. 13, § 95).